UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| VINITA KING, o/b/o W.G., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.  4:14CV116 TIA |
| | ) | |
| CAROLYN W. COLVIN, Acting | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

Plaintiff Vinita King brings this action under 42 U.S.C. § 405(g) for judicial review of the Commissioner's final decision denying her application for child's supplemental security income (SSI) filed on behalf of her minor child under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381, *et seq.*  All matters are pending before the undersigned United States Magistrate Judge, with consent of the parties, pursuant to 28 U.S.C. § 636(c).  Because the Commissioner's final decision is supported by substantial evidence on the record as a whole, it is affirmed.

## I.  Procedural History

On November 30, 2012, following a hearing, an administrative law judge (ALJ) denied plaintiff's application for child's SSI benefits, which plaintiff

protectively filed on May 9, 2011, on behalf of her minor child, W.G.[1]  (Tr. 8-24.)

Plaintiff alleged a disability onset date of May 1, 2011.  (Tr. 34.)  On December 3,

2013, the Appeals Council denied plaintiff's request for review of the ALJ's

decision.  (Tr. 1-3.)  The ALJ's decision thus stands as the final decision of the

Commissioner.  42 U.S.C. § 405(g).[2]

In this action for judicial review, plaintiff contends that W.G.'s cognitive

impairments functionally equal a listed impairment inasmuch as they result in

marked limitations in two broad areas of functioning, namely, Acquiring and Using

Information, and Attending and Completing Tasks.  Plaintiff argues that the ALJ's

finding that W.G. suffered no limitations in the domain of Attending and

Completing Tasks is not supported by substantial evidence on the record as a

whole and requests that the Commissioner's decision be reversed.  For the reasons

that follow, the final decision of the Commissioner is affirmed.

## II.  Testimonial Evidence Before the ALJ

A hearing was held before an ALJ on October 9, 2012, at which plaintiff

---

[1] In her decision, the ALJ states that the application was protectively filed on May 9, 2011.  (Tr. 11.)  The application itself, however, does not appear in the administrative record presently before the Court for review.

[2] Plaintiff previously filed an application on behalf of W.G. for child's SSI benefits, which was denied by an ALJ on November 17, 2010, after a hearing.  Upon the Appeals Council's denial of plaintiff's request for review of this adverse decision, plaintiff sought judicial review of the Commissioner's final decision.  On March 1, 2013, United States Magistrate Judge Shirley Padmore-Mensah affirmed the final decision.  *See generally King v. Astrue*, Cause No. 4:11CV1923 SPM (E.D. Mo. 2013).

testified in response to questions posed by the ALJ and counsel. (Tr. 28-43.)

Plaintiff is W.G.'s mother. (Tr. 31.) At the time of the hearing, W.G. was in the fifth grade. He previously had been retained in school for one year to repeat either kindergarten or first grade. (Tr. 35.)

Plaintiff testified that W.G. is currently enrolled in special education classes and has problems with reading, becomes confused, and has difficulty understanding things. Plaintiff testified that W.G. cannot explain to her what he is learning in school. Plaintiff testified that W.G.'s grades are "okay but not too good," and not as good as they should be for his age and level. (Tr. 35-36.)

Plaintiff testified that W.G. has an IEP at school and is in the regular classroom as well as a resource room where he receives one-on-one instruction. Plaintiff testified that W.G. also seeks assistance from an additional teacher who is present in the regular classroom. Plaintiff testified to her belief that W.G. also receives help from peer tutors in the classroom. As part of his IEP, W.G. is given extra time to complete tests and exams. Plaintiff believes that W.G.'s most recent IEP placed his performance at the second grade level. (Tr. 38-39.)

Plaintiff testified that W.G. gets along with his teachers and has a few friends at school. Plaintiff testified that W.G.'s friends "bully" him and pick on him because he is not at their level in class. (Tr. 36.) Plaintiff testified that W.G. gets nervous every day and "shuts down." Plaintiff testified that W.G. talks to his

teachers when he is having such problems.  W.G. has not visited a private counselor outside of school.  (Tr. 39-40.)

Plaintiff testified that W.G. takes medication for allergies and headaches and experiences no side effects therefrom.  W.G. takes no other medications.  (Tr. 41.)

Plaintiff testified that W.G. takes out the trash at home as a chore, but she must repeatedly remind him to do so.  Plaintiff testified that W.G. is able to care for his personal needs and grooming, but she reminds him to do these things as well.  Plaintiff testified that W.G. likes to bowl and sometimes plays video games. He does not participate in any after-school sporting activities or any other type of youth activities.  Plaintiff testified that W.G. does not go to any friends' houses nor has any friends come to his house.  W.G. does not go outside and usually stays in the house to watch television or do homework.  Plaintiff testified that W.G. is always with her.  (Tr. 37-38, 41-42.)  Plaintiff testified that W.G. gets along with her and his twenty-year-old sister.  (Tr. 36-37.)

### III.  Medical and School Records

W.G. was seen at People's Health Centers on June 30, 2010, for complaints related to an upper respiratory infection.  (Tr. 295-97.)

In September 2010, W.G. took the Otis-Lemon School Ability Test (OLSAT) on which he scored below average in the verbal and non-verbal clusters. W.G. was nine years old and in the third grade.  (Tr. 192.)

Social/behavioral observations at school in November 2010 showed W.G. unable to make it through the day without "shutting down," which involved becoming tearful, hiding under a table, and refusing to comply with directives or getting started on work. W.G. was noted to struggle on a daily basis to show effort and begin tasks. W.G. was observed to stand up and shout "I'm frustrated" when frustrated with an assignment, and he would be sent to an alternative location to complete his work. (Tr. 270.)

Upon evaluation in February and March 2011, the Special School District determined that W.G. was eligible for IEP services, including 600 minutes of special education in the areas of reading and written expression. It was noted that W.G. had been diagnosed with a learning disability in the areas of reading fluency, basic reading, reading comprehension, and written expression. Intervention strategies and services that had been provided prior to being diagnosed were not effective. (Tr. 194.) It was noted that W.G. obtained the following IQ scores in January 2011: nonverbal-92, verbal-78, and full scale-84, and was observed during this testing to attend to tasks and materials appropriately for his chronological age, and to demonstrate adequate endurance and require little to no encouragement to complete all tasks presented. W.G. was reading at the first grade level. (Tr. 244, 250.) Teachers reported W.G. to have at-risk to significant concerns in the areas of depression, study skills, anxiety, attention problems,

atypicality, withdrawal, adapting readily to changes in the environment, and working well with others to accomplish a goal. (Tr. 251.) It was determined that W.G. needed specialized instruction in a step-by-step manner in reading and writing with frequent review, drill, and instruction taught at his current functioning level. It was noted that W.G. currently had difficulty following written directions, struggled with writing processes and expressing complex ideas, was easily frustrated by third grade expectations, was frustrated by not being able to keep up with his peers in the classroom, was easily discouraged by tasks that are difficult or perceived to be difficult, and was afraid to take risks in his learning. It was noted that W.G. would benefit from repeated review and drill; specialized instruction in the area of decoding; hands-on materials; visuals; rephrasing of directions; instructions that are systemic and explicit in the areas of basic reading, reading comprehension, and written expression; step-by-step process; immediate feedback; personal connections with staff; positive feedback; encouragement from all staff; common language from staff with respect to expectations; modeling of expectations; choice of tasks to prevent shutting down; reading tests; dictation to a scribe; extended time; adapted tests with multiple-choice format, if possible; chunking material; breaks when tasks are too difficult; variance of activities; break cards for frustration level; alternative setting for tests and instruction in reading, writing, and math. It was noted that all of W.G.'s grades were currently

modified and were based on first grade levels.  W.G. was noted to be working two grade levels below his same aged peers.  It was determined that W.G. would be placed in the regular classroom forty to seventy-nine percent of the time.  Testing accommodations included oral reading of assessments in math as well as extended time, use of a scribe, and testing individually in all subjects.  General accommodations were likewise provided for classroom instruction, including adapted text in language arts and reading, preferential seating, study guides, alternative settings for tests, shorter assignments with lower difficulty, extended time for completion of assignments, frequent breaks, and multiple choice formats for tests.  It was also determined that W.G. would participate in summer session services given his display of significant regression and his functioning at several years below his same aged peers.  (Tr. 217-36.)

W.G.'s end-of-year progress report for the third grade, dated May 2011, showed W.G. to have earned the following marks in Citizenship:  "Emerging" in the areas of observing classroom and school rules, accepting responsibility, and practicing self-control; and "Satisfactory" in the areas of being courteous and respectful to others, and working cooperatively with others.  In Work and Study Habits, W.G. earned the mark of Emerging in the areas of listening attentively, following directions, using time wisely, contributing to classroom discussions, working well independently, and demonstrating effort.  He earned a Satisfactory

mark in the areas of completing assignments on time, completing assignments neatly, keeping materials organized, and developing computer skills. W.G. earned an "Outstanding" mark in the area of writing legibly. In Communication Arts, W.G. earned the mark of Emerging in the area of listening attentively for learning, enjoyment, and exchange of information; and Satisfactory in the area of using oral language to gather information from, respond to, and inform others. W.G. earned a modified grade of B in Reading and Writing, with marks of Emerging or Satisfactory in all curriculum-specific areas such as using multiple strategies to gain meaning, making meaningful connections, using reference materials, and collecting ideas and plans for writing projects. W.G. was noted to read at the first grade level and to write three sentences to describe a story's beginning, middle, and end. W.G. earned a modified grade of C in Math, with marks of Emerging or Satisfactory in all curriculum-specific areas such as communicating mathematical thinking effectively and using effective strategies to solve problems. It was noted that W.G. continued to work on math facts up to 20 in addition and subtraction. He was instructed to work on telling time, counting money, and adding and subtracting two digit numbers during the summer. W.G. earned a B in Science and a modified grade of C in Social Studies. W.G. earned marks of Emerging or Satisfactory in Visual Arts, and Satisfactory in General Music and Physical Education. In no area of this progress report did W.G. receive the mark of "Needs

Improvement." (Tr. 183-87.)

W.G. was seen at People's Health Centers on May 16, 2011, for complaints related to an upper respiratory infection. (Tr. 298-300.)

In July 2011, Dr. Despine Coulis, a medical consultant with disability determinations, and Marshal Toll, Psy.D., a psychological consultant with disability determinations, completed a Childhood Disability Evaluation Form in which they opined that W.G.'s learning disability did not meet, medically equal, or functionally equal a listed impairment. Specifically, the consultants found that W.G. experienced marked limitations in the domain of Acquiring and Using Information; less than marked limitations in the domains of Attending and Completing Tasks, Interacting and Relating with Others, and Moving About and Manipulating Objects; and no limitations in the domains of Caring for Yourself, and Health and Physical Well-Being. (Tr. 309-15.)

W.G. was seen at People's Health Centers on September 16, 2011, for a yearly physical examination and for complaints related to allergic rhinitis. W.G.'s general social history was noted to include reports that W.G. cooperated with family, friends, and teachers. W.G. was noted to have enough friends. It was noted that W.G. earned good grades at school and was performing at the second grade level. W.G. was observed to behave appropriately for his age. (Tr. 319-23.)

An IEP Progress Report dated November 2011 showed W.G. to be writing at

the second grade level and to be progressing nicely with reading and spelling. (Tr. 237.)

W.G. underwent IEP review in February 2012. He was in the fourth grade. W.G.'s difficulties noted in the February/March 2011 IEP remained the same, as well as opined benefits from various learning and teaching strategies. W.G.'s math teacher noted that W.G. used strategies that helped him complete math problems. It was noted that while W.G. struggled to begin each new problem, he benefited from reminders to use his strategies. It was noted that previous testing through the Special School District placed W.G.'s cognitive ability in the below average range. W.G. scored in the "below basic" range on the MAP tests in mathematics and communication arts. W.G.'s goals were noted to be to deal with his frustration, have a positive attitude, and challenge himself to attempt to read at a higher level. W.G.'s reading goal was to increase his basic reading and comprehension skills to a second or third grade level. It was determined that W.G. would receive 315 minutes of special education services in reading and 315 minutes of special education services in written expression each week. W.G. would also receive thirty minutes of social work services each week. It was determined that W.G. would be placed in the regular classroom at least eighty percent of the time. Testing accommodations would be provided in communication arts and math, including oral reading of the assessments, extended time, taking breaks, and testing

with small groups.  General accommodations were likewise provided for classroom instruction, including adapted text in language and reading, preferential seating, alternative settings for tests, shorter assignments with lower difficulty, extended time for completion of assignments, and multiple choice formats for tests.  (Tr. 196-213.)

W.G.'s end-of-year progress report for the fourth grade, dated May 2012, showed W.G. to have earned a mark of Satisfactory in all subset areas of Citizenship and Communication Arts.  In Work and Study Habits, W.G. earned the marks of Emerging in the area of using time wisely; Satisfactory in the areas of listening attentively, following directions, completing assignments on time, contributing to class discussions, working well independently, demonstrating knowledge of computer skills, and demonstrating effort; and Outstanding in the areas of completing assignments neatly, keeping materials organized, and writing legibly.  W.G. earned an A in Reading and a B in Writing, with marks of Emerging or Satisfactory in all curriculum-specific areas.  W.G. was noted to read at the second grade level, and he was working more independently with his editing and revising of written pieces.  W.G. earned a modified grade of B in Math, with marks of Emerging or Satisfactory in the curriculum-specific areas of understanding concepts of computation, patterns, and geometry; Satisfactory in the area of communicating mathematical thinking effectively; and Outstanding in the area of

using effective strategies to solve problems. It was noted that W.G. was becoming more consistent in his "ability to tackle new problems and use his strategies to solve them." W.G. earned marks of Satisfactory in Visual Arts, General Music, and Physical Education, with notations by teachers showing W.G. to be confident and to participate in class. W.G. was also observed to be an organized student and to work hard. (Tr. 178-82.)

W.G. participated in summer school through the Special School District in May and June 2012. It was noted that W.G. was reading at the beginning second grade level and "did a nice job" on reading and writing assignments. (Tr. 214.)

W.G. returned to People's Health Centers on August 20, 2012, for his yearly physical examination. W.G.'s general social history was noted to include reports that W.G. cooperated with family, friends, and teachers and that he had enough friends. There were no reported concerns regarding W.G.'s relationships. It was noted that W.G. was in the fifth grade, earned good grades, and performed at grade level. W.G. was observed to behave appropriately for his age. (Tr. 324-29.)

### IV. Discussion

A claimant under the age of eighteen is considered disabled and eligible for SSI under the Social Security Act if he "has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to

last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(i).

The Commissioner undergoes a three-step sequential evaluation process when determining whether a child is entitled to SSI benefits. First, the Commissioner must determine whether the child is engaged in substantial gainful activity. If not, the Commissioner must then determine whether the child's impairment, or combination of impairments, is severe. Finally, if the child's impairment(s) is severe, the Commissioner must determine whether such impairment(s) meets, medically equals or functionally equals the severity of an impairment listed in Appendix 1 of Subpart P of Part 404 of the Regulations. 20 C.F.R. § 416.924(a); *Garrett ex rel. Moore v. Barnhart*, 366 F.3d 643, 647 (8th Cir. 2004). If the impairment(s) meets or medically equals a Listing, the child is disabled. *Garrett*, 366 F.3d at 647. If a child's impairment does not meet or medically equal a listed impairment, the Commissioner will assess all functional limitations caused by the child's impairment to determine whether the impairment functionally equals the Listings. 20 C.F.R. § 416.926a.

To functionally equal a listed impairment, the child's condition must result in an "extreme" limitation of functioning in one broad area of functioning, or "marked" limitations of functioning in two broad areas of functioning. 20 C.F.R. § 416.926a(a). The domains are "broad areas of functioning intended to capture all

of what a child can or cannot do." 20 C.F.R. § 416.926a(b)(1). The six domains used by the Commissioner in making such a determination are: 1) Acquiring and Using Information; 2) Attending and Completing Tasks; 3) Interacting and Relating with Others; 4) Moving About and Manipulating Objects; 5) Caring for Oneself; and 6) Health and Physical Well-Being. *Id.* If this analysis shows the child not to have an impairment which is functionally equal in severity to a listed impairment, the ALJ must find the child not disabled. *Oberts o/b/o Oberts v. Halter*, 134 F. Supp. 2d 1074, 1082 (E.D. Mo. 2001).

Here, the ALJ underwent the three-step analysis and found W.G. to be a school-aged child and not to have engaged in substantial gainful activity since the application filing date of May 9, 2011. The ALJ found W.G.'s impairments of learning disability and borderline intellectual functioning to be severe, but that W.G. did not have an impairment or combination of impairments that met or medically equaled the severity of a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1. Turning to whether W.G.'s impairments functionally equaled a listed impairment, the ALJ found W.G. to have marked limitations in the domain of Acquiring and Using Information and to have no limitations in any of the five remaining domains. Given that W.G. did not have an extreme limitation of functioning in one broad area of functioning nor marked limitations of functioning in two broad areas of functioning, the ALJ determined him not to be disabled at

any time since the application date of May 9, 2011.  (Tr. 11-24.)

Plaintiff challenges the ALJ's decision to the extent she found W.G. not to have marked limitations in the domain of Attending and Completing Tasks. Plaintiff does not challenge the ALJ's decision with respect to the other domains.

The Commissioner's findings are conclusive upon this Court if they are supported by substantial evidence.  42 U.S.C. § 405(g); *Young v. Shalala,* 52 F.3d 200 (8th Cir. 1995) (citing *Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993)). Substantial evidence is less than a preponderance but enough that a reasonable person would find it adequate to support the conclusion.  *Briggs v. Callahan*, 139 F.3d 606, 608 (8th Cir. 1998).  In evaluating the substantiality of the evidence, the Court must consider evidence which supports the Commissioner's decision as well as any evidence which fairly detracts from the decision.  *Id.*  Where substantial evidence supports the Commissioner's decision, the decision may not be reversed merely because substantial evidence may support a different outcome.  *Id.*

In determining functional equivalence, a child-claimant has a "marked" limitation in a domain when his

> impairment(s) interferes seriously with [his] ability to independently initiate, sustain, or complete activities.  [His] day-to-day functioning may be seriously limited when [his] impairment(s) limits only one activity or when the interactive and cumulative effects of [his] impairment(s) limit several activities.  "Marked" limitation also means a limitation that is "more than moderate" but "less than extreme."

20 C.F.R. § 416.926a(e)(2)(i).  A child will be found to have an "extreme" limitation when the impairment "interferes very seriously with [the child's] ability to independently initiate, sustain, or complete activities."  20 C.F.R. § 416.926a(e)(3).  A child's functional limitations in each domain "must result from [his] medically determinable impairment(s)."  20 C.F.R. § 416.926a(b)(2).

In determining whether a child-claimant's functioning may be marked or extreme, the Commissioner is to review all the evidence of record and "compare [the child's] functioning to the typical functioning of children [the child's] age who do not have impairments."  20 C.F.R. § 416.926a(f)(1); *see also* 20 C.F.R. § 416.926a(b) (in determining child-claimant's functioning, Commissioner looks "at how appropriately, effectively and independently [the child] perform[s] [his] activities compared to the performance of other children [the child's] age who do not have impairments."); 20 C.F.R. § 416.924a(b)(5).  For children who have spent time in structured or supportive settings, such as special classrooms or residential facilities, the Commissioner is to consider whether and to what extent such structured setting affects the child's functional limitations and how the child would function outside of such setting.  20 C.F.R. § 416.924a(b)(5)(iv).

With respect to the domain of Attending and Completing Tasks, the Commissioner is to consider how well the child-claimant is able to focus and maintain his attention; and how well he begins, carries through, and finishes his

activities, including the pace at which he performs activities and the ease with which he changes them. 20 C.F.R. § 416.926a(h); *Hudson ex rel. Jones v. Barnhart*, 345 F.3d 661, 667 (8th Cir. 2003).

> Attention involves regulating your levels of alertness and initiating and maintaining concentration. It involves the ability to filter out distractions and to remain focused on an activity or task at a consistent level of performance. This means focusing long enough to initiate and complete an activity or task, and changing focus once it is completed. It also means that if you lose or change your focus in the middle of a task, you are able to return to the task without other people having to remind you frequently to finish it.

20 C.F.R. § 416.926a(h)(1)(i). The Regulations provide that a school-age child should be able to

> focus [his] attention in a variety of situations in order to follow directions, remember and organize [his] school materials, and complete classroom and homework assignments. [He] should be able to concentrate on details and not make careless mistakes in [his] work . . . . [He] should be able to change [his] activities or routines without distracting [himself] or others, and stay on task and in place when appropriate. [He] should be able to sustain [his] attention well enough to participate in group sports, read by [himself], and complete family chores. [He] should also be able to complete a transition task (e.g., be ready for the school bus, change clothes after gym, change classrooms) without extra reminders and accommodation.

20 C.F.R. § 416.926a(h)(2)(iv).

In this case, the ALJ found W.G. to have no limitations in the domain of Attending and Completing Tasks. The ALJ specifically noted W.G.'s mother to have testified that W.G. takes out the trash and plays video games. The ALJ further noted that W.G.'s fourth grade progress report showed him to have

achieved the marks of "Satisfactory" or "Emerging" in the following areas: listens attentively, follows directions, uses time wisely, completes assignments on time, contributes to class discussions, works well independently, demonstrates knowledge of computer skills, and demonstrates effort. (Tr. 19.) In addition, as noted by the ALJ, W.G. achieved an "Outstanding" mark in the areas of writing legibly, keeping materials organized, and completing assignments neatly. (*Id.*) The ALJ observed that these rankings are higher than "Needs Improvement." Indeed, throughout W.G.'s fourth grade year, none of his teachers reported that W.G. needed improvement in any area. The undersigned also notes that W.G. was observed by his teachers to actively participate in his classes and to be a hard worker. W.G.'s teachers also reported that W.G. used strategies to initiate and complete tasks, was an organized student, and worked more independently. Notably, at the conclusion of fourth grade, W.G. was in a regular classroom eighty percent of the time. Where school records show a child-claimant able to function in a normal classroom, to be capable of doing his work, and enjoy an improvement in his overall condition, nothing more than moderate limitations in the domain of Attending and Completing tasks are shown. *E.g., Pepper ex rel. Gardner v. Barnhart*, 342 F.3d 853, 855-56 (8th Cir. 2003).

To the extent W.G. performed below grade level in reading and writing and obtained below average scores on standardized assessments, the ALJ properly

considered such circumstances in finding W.G. to have marked limitations in the domain of Acquiring and Using Information. *See Neal ex rel. Walker v. Barnhart*, 405 F.3d 685, 690 (8th Cir. 2005). Experiencing marked limitations in this domain, however, does not *ipso facto* translate into marked limitations in the separate domain of Attending and Completing Tasks; especially in the circumstances here where W.G. was repeatedly observed to be organized, complete assignments, and work independently. In addition, despite W.G.'s below average intellectual performance during standardized assessments, he nevertheless was observed to attend to tasks and materials appropriately during such testing, as well as demonstrate adequate endurance and require little to no encouragement to complete all tasks presented. Given these reports by W.G.'s teachers, test administrators, and school evaluators, it cannot be said that W.G. exhibited limitations in the domain of Attending and Completing Tasks so significant that they rise to the level of "marked" limitations under the Regulations. As such, a review of the record shows there to be substantial evidence to support the ALJ's conclusion that W.G. did not experience marked limitations in the domain of Attending and Completing Tasks.

In her written decision, the ALJ accorded little weight to the State agency opinion that W.G. had less than marked limitations in this domain, finding that the evidence of record showed W.G. to instead have no limitations. (Tr. 19.) To the

extent plaintiff challenges the ALJ's determination to discount this State agency opinion, the undersigned notes that even if the ALJ had accorded significant weight to this opinion and found W.G.'s limitations to indeed be "less than marked" as opined, they nevertheless would not rise to the level of "marked" limitations such that functional equivalence would be found.

## V. Conclusion

A reading of the ALJ's decision shows the ALJ to have considered all of the evidence of record and to have based her conclusions on her review of the record as a whole. The ALJ specifically reviewed and considered the reports and observations of W.G.'s teachers, school evaluators, and others who often saw W.G. and could describe his functioning at home and at school. *See* 20 C.F.R. § 416.926a(b)(3). Upon discussing all the evidence of record, the ALJ determined W.G.'s impairment not to meet, medically equal, or functionally equal a listed impairment, and thus found that W.G.'s condition was not disabling under the Regulations. For the reasons set out above on the claim raised by plaintiff on this appeal, the ALJ's determination is supported by substantial evidence on the record as a whole. Because the Commissioner's final decision that W.G. is not disabled is supported by substantial evidence on the record as a whole, it is affirmed.

Therefore, for all of the foregoing reasons,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is

affirmed, and plaintiff's Complaint is dismissed with prejudice.

A separate Judgment in accordance with this Memorandum and Order is entered this same date.


_Terry I. Adelman_
UNITED STATES MAGISTRATE JUDGE



Dated this  23rd  day of January, 2015.